

FILED
JAMES BONINI
CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## CINCINNATI DIVISION

04 FEB -3 PM 3: 28

DONNA FARMER                                     :     Case No. **1 : 04 C V 080 .**
and all others similarly situated,
c/o Sirkin Pinales & Schwartz LLP                :     Judge _____ **WEBER** ___
105 West Fourth Street, Suite 920
Cincinnati, Ohio 45202;                          :     Magistrate Judge Perelman

JUANITA MITCHELL                                 :
and all others similarly situated,
c/o Lawson and Associates                        :
808 Elm Street, Suite 100
Cincinnati, Ohio 45202;                          :

JACKIE GAINES                                    :
and all others similarly situated,
c/o Lawson and Associates                        :     **CLASS ACTION COMPLAINT FOR**
808 Elm Street, Suite 100                              **DECLARATORY, INJUNCTIVE,**
Cincinnati, Ohio 45202;                          :     **AND MONETARY RELIEF**

ANNIE DAVIS                                      :
and all others similarly situated,
c/o Sirkin Pinales & Schwartz LLP                :
105 West Fourth Street, Suite 920
Cincinnati, Ohio 45202;                          :

        and                                      :

BUDGET REAL ESTATE, INC.                         :
2930 West Imperial Highway, Suite 314
Inglewood, California 90303;                     :

        Plaintiffs,                              :

v.                                               :

CITY OF CINCINNATI, OHIO,                        :
a municipal corporation,
801 Plum Street                                  :

Come now Plaintiffs Donna Farmer, Juanita Mitchell, Jackie Gaines, and Annie Davis, on behalf of all others similarly situated, and Budget Real Estate, Inc., on its own behalf, who for their complaint against Defendant City of Cincinnati, allege as follows:

## PRELIMINARY STATEMENT

1.  This is an action pursuant to 42 U.S.C. §§ 1981, 1983, 1985, and 3604 and other relevant federal and state laws to redress the City of Cincinnati's unlawful conduct in assisting with and assuring the closure of the Huntington Meadows apartment complex which resulted in mass evictions. Plaintiffs Farmer, Mitchell, Gaines, and Davis, as former residents of the complex, bring this action on behalf of themselves and all other similarly situated residents who were injured as a result of the City's conduct. Plaintiff Budget Real Estate, Inc., as a prospective buyer of the Huntington Meadows property, brings this action on its own behalf. Collectively, Plaintiffs Farmer, Mitchell, Gaines, Davis and Budget Real Estate, Inc. seek declaratory, injunctive, and monetary relief to not only redress the City's unlawful actions in closing the property, but to ensure that any future redevelopment plans backed by City financing will maintain the complex as affordable housing.

## JURISDICTION

2.  Jurisdiction is conferred on this Court by virtue of 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3), which authorize the federal courts to resolve federal constitutional questions. This Court may exercise pendent jurisdiction over Plaintiff's state law claims on the basis of 28 U.S.C. § 1367.

3.  Venue in this district and division is appropriate pursuant to 28 U.S.C. § 1391(b) and (c), as the various acts which form the basis of this complaint occurred with the Cincinnati Division of the Southern District of Ohio.

2

## PARTIES

4.      Donna Farmer is a current resident of the City of Cincinnati and a former tenant at the Huntington Meadows complex. She resided in various units at the complex from 1991 until September 2002 when the property was closed and she was evicted. Ms. Farmer is a mother and an African-American female.

5.      Juanita Mitchell is a current resident of the City of Cincinnati and a former tenant at the Huntington Meadows complex. Ms. Mitchell resided at the property and served as the president of the Huntington Meadows Resident Council until it was closed in September 2002 and she was evicted. Ms. Mitchell is an African-American female.

6.      Jackie Gaines is a current resident of the City of Cincinnati and a former tenant at the Huntington Meadows complex. Ms. Gaines only began leasing her apartment at Huntington Meadows after the property was subject to foreclosure. She left the property when it closed in September 2002 and she was evicted. Ms. Gaines is an African-American female.

7.      Annie Davis is a current resident of the City of Cincinnati and a former tenant at the Huntington Meadows complex. She lived at Huntington Meadows for approximately six years before being evicted when the property was closed. Ms. Davis is an African-American female.

8.      Budget Real Estate, Inc. is a for-profit corporation organized under the laws of the State of California and having as its principal place of business 2930 West Imperial Highway, Suite 314, Inglewood, California 90303. Budget Real Estate specializes in restoring, refurbishing, and maintaining affordable housing developments throughout the country and is currently involved in such a project in Columbus, Ohio. By and through its agent, Jorge Newbery, Budget attempted to purchase the Huntington Meadows property, to refurbish it, and to maintain it as affordable housing.

3

9.     The City of Cincinnati is a municipal corporation duly organized under the laws of the State of Ohio. The City is represented by its mayor, vice mayor, and a council of nine members who are elected at large by the voting public. The City also functions through numerous departments and committees, including a Planning Commission, a Health Committee, a Health Department, a Department of Economic Development, and a Department of Neighborhood Services.

10.     The City's current Vice Mayor is Alicia Reece. Ms. Reece was first elected to City Council in November of 1999, was appointed Vice Mayor following her successful reelection campaign in 2001, and was again reelected and reappointed as Vice Mayor in 2003. Ms. Reece is the daughter of Steve Reece, a prominent businessman and entrepreneur who owns property near the Huntington Meadows development. Upon information and belief, Ms. Reece also maintains a financial interest in the property.

## STATEMENT OF THE FACTS

11.     Until its closure in September 2002, Huntington Meadows was the City of Cincinnati's largest complex of affordable housing. Containing nearly 1100 apartment units, the complex catered to single-parent, female-headed families, the elderly, and the working poor. The majority of residents were African-American females, some with children. While a small number of residents did obtain some form of government assistance, most were full-time employees working in the service and manufacturing industries. Many of the residents, including Plaintiff Farmer, had resided at the complex for over a decade. Upon information and belief, each tenant executed an identical lease for their apartments.

12.     Huntington Meadows is located in the neighborhood known as Bond Hill and spans the triangular-shaped quadrant between Langdon Farm Road, Seymour Avenue, and Reading Road.

4

The property is immediately adjacent to a formerly defunct shopping center known as Swifton Commons, which was recently renamed Jordan Crossing. Also near the property is a conference center called Integrity Hall, which is owned by the father of Vice Mayor Alicia Reece.

### The PM Group

13.     In September of 1998, the City of Cincinnati, Hamilton County, and private funders worked collaboratively to provide $30 million in assistance to PM Group, Inc., a for-profit corporation based in Michigan, to renovate the Huntington Meadows complex. As part of the financing package, the City of Cincinnati provided a below-market loan of nearly $4 million. Vice Mayor Alicia Reece was not a member of City Council at the time and therefore did not vote on the financing proposal.

14.     In addition to the $4 million loaned by the City of Cincinnati, Hamilton County provided over $17 million in tax-exempt bonds to fund the renovation project. The County's financing agreement with Huntington Meadows Limited, the PM Group subsidiary which owned the complex, specifically precludes use of the property for anything other than affordable housing while the bonds are outstanding. (See Financing Agreement, Ex. A to this Complaint). This provision runs with the land and therefore requires that the Huntington Meadows property be maintained as affordable housing for the duration of the bonds.

15.     The year following the $30 million renovation plan, Alicia Reece was elected to City Council. As part of her initial platform, she urged the City to spend an additional $30 million to redevelop the Seymour Avenue area which buttresses not only the Huntington Meadows complex, but also the convention center owned by her father. To this end, she made a formal motion before City Council on May 24, 2000 to enact such an initiative.

16.     Ms. Reece's platform resulted in the creation of the Seymour Business District Plan, which was approved by the Cincinnati Planning Commission on October 20, 2000. Alicia Reece's father, Steve Reece, appeared before the Planning Commission to voice his support for the plan. (See October 20, 2000 Planning Commission Minutes, Ex. B to this Complaint). Mr. Reece also purported to speak for other local business owners who he claimed would pledge their private financial support for any redevelopment initiatives. (*Id.*) In addition, Alicia Reece also appeared before the Planning Commission, despite not being a member or an invited presenter.

17.     Notably absent from the meeting was any representative of Huntington Meadows. While it appears that other area businesses were invited to participate in the planning process and to have input into the strategic plan, upon information and belief, no Huntington Meadows representative was invited to attend the Planning Commission meeting or to otherwise have input into the redevelopment vision.

18.     A comprehensive development tool, the Seymour Business District Plan called for the Seymour Avenue area to be redeveloped into a retail, commercial, housing, entertainment, and recreational district by providing tax abatements, grants, and other incentives to property owners in the area. It also contained a component designed to promote home-ownership nearby, which directly contradicts Huntington Meadows' mission to provide affordable rental housing for, among other groups, single mothers.

19.     The full City Council adopted the Seymour Business District Plan on March 7, 2001, following a City-financed study that was required to designate the region for community reinvestment.

20.     Following the adoption of the plan, business owners in the Bond Hill area expressed concern that the plan would not be viable should Huntington Meadows continue to house low-income families.  In this regard, the redevelopment of Huntington Meadows became an implicit component of the Seymour Business District Plan.  Essential to the success of the Seymour Business District Plan was the conversion of Huntington Meadows from affordable rental housing to more expensive, single-family residences.  This was in keeping with the Plan's provision encouraging home-ownership, and not affordable rentals, in the neighborhood.

21.     Both the redevelopment of Huntington Meadows and the formal adoption of the Seymour Business District Plan would inherently result in a financial benefit to Alicia Reece's father, who owns neighboring property.  Upon information and belief, Ms. Reece was also an officer in the corporations that owned nearby property and therefore would have directly benefitted herself.  The development of the area into a commercial center attractive to middle-class families promised to raise property values and to import additional customers and clients to the neighborhood.

22.     Beginning in 2001, shortly after City Council passed the Seymour Business District Plan, PM Group began to have difficulty managing and maintaining the Huntington Meadows property.  The company sought to evict over 300 tenants who accepted no-deposit offers to move into the complex, but later failed to pay their rent.  In addition, multiple complaints were lodged with the management about rodent infestation, broken appliances, and other maintenance problems.

23.     Huntington Meadows Limited, the PM Group subsidiary that owned the property, then began to default on its mortgage payments.  The company missed its May 2001 payment and was subject to a foreclosure action filed by the Federal National Mortgage Association ("Fannie Mae") in the Hamilton County Court of Common Pleas.  (See *Federal National Mortgage Ass'n v.*

7

*Huntington Meadows Ltd.*, Hamilton Cty. Com. Pl. No. A0103458). Near that time, PM Group, the parent company of Huntington Meadows Limited, filed for bankruptcy in Michigan.

24.     Pursuant to federal law, the filing of the bankruptcy proceeding served to automatically stay the foreclosure proceeding pending in the Common Pleas Court. Apparently believing this stay to preclude the court from scheduling reports or case management conferences, the attorneys for Fannie Mae failed to attend a pre-trial conference scheduled for September 17, 2001. The case was then dismissed by a magistrate for want of prosecution.

25.     The court, however, reinstated the foreclosure action by a *nunc pro tunc* order issued October 30, 2001. As a result, the case was reactivated and Fannie Mae was free to proceed with its foreclosure claims against Huntington Meadows Limited.

26.     Shortly after the foreclosure proceeding was reinstated, Vice Mayor Alicia Reece began a series of repeated inquiries into the status of the property. For example, on November 21, 2001, Ms. Reece filed a handwritten motion at a council meeting requesting an update on "the ownership of Huntington Meadows and the City's involvement." (See November 21, 2001 Motion, Ex. C to this Complaint).

27.     A written response to Ms. Reece's motion was provided on December 12, 2001. In that report, Peg Moertl, the City's Director of Neighborhood Services, emphasized the importance of maintaining Huntington Meadows as affordable housing. She stated:

> Although vacancy rates are currently in excess of 15 percent, the number of tenants affected by a possible foreclosure is significant. Huntington Meadows has been one of the few complexes to welcome young single mothers with children, who are among the group of hard-to-house citizens. *The failure of a project this large would have a significant impact on the neighborhood.* Finally, of course, the City's investment is at risk.

8

(See December 12, 2001 Memorandum, Ex. D to this Complaint (emphasis added)).

28.     Exactly one week later, an additional report was circulated to the City Council by the Department of Economic Development, not apparently in response to any pending motion or request by council. (See December 19, 2001 Memorandum, Ex. E to this Complaint). The report discussed in detail the status of the Seymour Business District Plan. As of December 19, 2001, several City-backed initiatives had been completed in the area, including the issuance of a $400,000 forgivable loan to the Allen Temple Real Estate Foundation to purchase Swifton Commons. Also planned was the acquisition of the former Elder-Beerman property at Swifton Commons by the Community Action Agency for its new headquarters. The report also references Integrity Hall, the convention center owned by Alicia Reece's father.

29.     Following the issuance of the December 19, 2001 Seymour Business District Plan report, Peg Moertl, who just seven days earlier authored the report emphasizing the importance of maintaining the Huntington Meadows complex, appeared on television regarding the property and did an "about face." Contrary to the position she advocated in the December 12, 2001 report, Ms. Moertl reported that maintaining Huntington Meadows as affordable housing was no longer in the interests of "the stakeholders" and the City Council. This statements marks a complete change in Ms. Moertl's opinion of the Huntington Meadows development.

30.     Also in late December 2001, Fannie Mae was released from the automatic stay in the bankruptcy proceeding and was therefore free to pursue foreclosure of the Huntington Meadows property.

31.     In conjunction with the foreclosure action, a receiver was appointed to manage the Huntington Meadows property.

32.     The receiver initially attempted to evict large numbers of residents based upon late rent payments.  That strategy, however, failed to result in substantial evictions when a Hamilton County Municipal Court magistrate ruled that Huntington Meadows' history of accepting late payments rendered the evictions unfair.

33.     The receiver, Habitat America, then commissioned a study to determine whether the residents' maintenance complaints were caused by mismanagement or instead signified greater structural or environmental problems with the buildings.  Conducted by Clayton Group Services, the study began on May 21, 2002 and a final report was issued on July 1, 2002.  The report indicated that asbestos, mold, and other bio-contaminants were in fact present on the property and recommended $10.5 million in remediation to clean up the property.

34.     Because of uncertainty as to the levels of asbestos and mold, which could pose health risks to the residents, the Clayton report recommended that full inspections be made by the City Health Department to determine what, if any, risk actually existed for the tenants.

35.     In light of Clayton's involvement, the City Health Department conducted its own inspection of the property and issued three key reports of its own which contradict the Clayton report's findings.  These reports were made in response to a May 22, 2002 motion by Alicia Reece for an update on the asbestos situation.

36.     First, on June 12, 2002, Assistant Health Commissioner Dr. Walter Tandy appeared in person before the City Health Committee, which Alicia Reece chairs, and testified that asbestos was found in the crawl spaces and boiler room but not in any apartments.  Based on this finding, Dr. Tandy concluded that there was no safety hazard for the residents.

10

37.    Second, on June 26, 2002, the City Manager filed a written report with City Council echoing Dr. Tandy's testimony that, while there was evidence of asbestos in non-residential areas of the complex, no safety hazard existed for the residents.  (See June 26, 2002 Report, Ex. F to this Complaint).

38.    Third, inspections of individual units following the issuance of the July 1, 2002 Clayton report indicated that the unhealthy conditions were not as widespread as Clayton had reported.  These inspections also suggested that the $10.5 million remediation estimate reached by Clayton may in fact have exaggerated the cost of cleaning up the property.

39.    Despite these reports, on July 9, 2002, Vice Mayor Alicia Reece wrote to the Housing and Urban Development office in Washington, DC to request relocation assistance for the Huntington Meadows residents.  (See July 9, 2002 Letter, Ex. G to this Complaint).  In her letter, Ms. Reece either falsely reported the conditions of the complex, or blatantly ignored her City's Health Department report and findings and contradicted the information she received from the City's own health inspectors, instead indicating that the presence of asbestos and mold posed a significant health risk to the residents.  She also informed HUD officials that the complex would be closed and that the tenants would need to relocate.  Significantly, her letter was written before the Cincinnati Municipal Housing Authority notified tenants of the need to vacate the property, and nearly three weeks prior to an agreed order in the foreclosure proceeding allowing the property to be closed and the tenants evicted.

40.    That agreed order was filed on July 29, 2002.  (See Agreed Order, Ex. H to this Complaint).  The order permits the property to be closed and authorizes the receiver to terminate all existing leases effective August 31, 2002.  Pursuant to the agreement, tenants who agreed to

11

voluntarily vacate the property by September 3, 2002 would receive a $500 check and other incentives, provided that their apartments were left in good condition and they agreed not to sue PM Group, Huntington Meadows Limited, or the receiver. Many residents never received the promised $500 and were left with the meager $99 provided by the City at Ms. Reece's urging.

41.     In the weeks surrounding the closure of the property, Ms. Reece spearheaded efforts to ensure that the tenants actually left the complex. Prior to the entry of the agreed order but after the Clayton report was issued, Ms. Reece hosted meetings at which she informed the residents that the City was financially unable to assist them in relocating. Later, she introduced a proposal that called for $50,000 of City funding to be allocated for relocation assistance. With 500 remaining tenants, this amounted to only $99 per tenant. She also approached neighborhood churches about sponsoring families in need of help as a result of the foreclosure.

42.     In addition, the Community Action Agency ("CAA") also addressed the tenants at community meetings to discuss the eviction problem. Upon information and belief, the CAA urged tenants to accept the $500 relocation package and to vacate the property. Upon information and belief, this was done at the urging of Ms. Reece.

43.     The Huntington Meadows complex officially closed on September 3, 2002. While some tenants remained on premises and refused to move, they were eventually relocated to other residences and shelters. Today, the Huntington Meadows property remains uninhabited and boarded up.

44.     Neither the City nor any other governmental entity ever conducted a complete, written audit of the PM Group and its subsidiary Huntington Meadows Limited. To date, the exact use of the $30 million committed towards renovations in 1998 is uncertain.

45.     What is certain is that the $17 million bonds issued by Hamilton County are still outstanding. The Internal Revenue Service has begun an inquiry into the status of the bonds and whether a proper accounting was made at the time the property was foreclosed. (See IRS Letters, Ex. Q to this Complaint).

### The Budget Real Estate Offer

46.     Budget Real Estate, Inc. is a for-profit company based in Southern California. As its principle mission, Budget buys troubled affordable housing developments and works with the residents to improve them. To this end, Budget has successfully turned around apartment complexes in Los Angeles, California, Kansas City, Missouri, and most recently the PM Group's other publicly funded failure, the 1100-unit Woodland Meadows development in Columbus, Ohio. (See Newspaper Article, Ex. I to this Complaint).

47.     Budget is comprised of three principle members, Allan Lowy, Howard Fuhrman, and Jorge Newbery. Mr. Lowy is an attorney and handles the legal aspects of the operation, Mr. Fuhrman is an accountant and specializes in finance, and Mr. Newbery is a real estate broker and developer who typically manages Budget's properties.

48.     In a letter dated August 23, 2002, Mr. Newbery made an offer to Fannie Mae to purchase the Huntington Meadows property for $2 million. (See August 23, 2002 Letter, Ex. J to this Complaint). In the letter, Mr. Newbery emphasized Budget's awareness of possible environmental problems at the site and expressed Budget's intent to maintain the property as affordable housing. In addition, Mr. Newbery also indicated that Budget's purchase offer would be privately financed by Aztec Financial and not by the government. This offer was made at a time when tenants were still occupying the property and before the complex actually closed.

13

49.     Budget's initial offer letter was followed by more detailed correspondence.  On September 3, 2002, Mr. Newbery forwarded an additional letter to Fannie Mae detailing Budget's accomplishments in revitalizing affordable housing developments and reiterating its desire to do the same in Cincinnati.  (See September 3, 2002 Letter, Ex. K to this Complaint).  An additional letter confirming Budget's financing package was sent to Fannie Mae from Aztec Financial on September 10, 2002.  (See September 10, 2002 Letter, Ex. L to this Complaint).

50.     Given the importance of the Huntington Meadows complex to the Cincinnati community, Fannie Mae representatives recommended that Mr. Newbery meet with City and County officials about Budget's proposal.  Mr. Newbery and Mr. Lowy then traveled to Cincinnati on September 19, 2002 to meet separately with Hamilton County Commissioner Todd Portune and later with Peg Moertl and a member of Alicia Reece's staff.  (See September 12, 2002 Letter, Ex. M to this Complaint).

51.     During separate meetings with Ms. Moertl and Ms. Reece's representative, both discouraged Budget from buying Huntington Meadows.  They expressed concern about Budget's intention to maintain the complex as affordable housing and indicated that Budget's vision did not comport with the City's intentions for the property.  To this end, Ms. Moertl and Ms. Reece's representative stated that the City's vision was to demolish the existing structures and rebuild more expensive townhomes and single-family houses on the site.  Because Budget's proposal did not fit with this design, Ms. Moertl and Ms. Reece's representative indicated their intention to discourage Fannie Mae from selling to Budget.

52.     The plan conveyed to Mr. Newbery and Mr. Lowy during this meeting demonstrates why the City and its representatives allowed the tenants of Huntington Meadows to be evicted and

14

permitted the tenants to believe that the complex caused a risk to their health.  On information and belief, no tenant to date has received medical treatment or has been diagnosed with any disease or condition that can be linked to Huntington Meadows.

53.     Shortly after Budget's meeting with Ms. Moertl and Ms. Reece's staff member, Fannie Mae proceeded to sell their Note to another company.  Upon information and belief, Budget's offer was not accepted because the City communicated its displeasure with Budget's plan to maintain the property as affordable housing.

54.     Upon information and belief, there is no evidence that the receiver in the foreclosure action ever notified the court of Budget's offer or the City's reasons for blocking it.

### The Winn Company and RCM

55.     Shortly after Mr. Newbery met with City representatives, Fannie Mae began to consult with another developer, The Winn Company out of Boston, Massachusetts.  In the interim, an appraisal of the property was conducted in the foreclosure action, and the initial assessment valued the property at $3.9 million.  The Note sold to the Winn Company for what is believed to be a purchase price of $1 million.  That price was $1 million less than Budget's offer and $2.9 million less than the appraised value of the property.

56.     The property was then set to be auctioned by the Sheriff on January 23, 2003.  That auction, however, was continued so that the Winn Company could develop a more specific site plan for the property.  (See Entry Withdrawing Property from Sheriff's Sale, Ex. N to this Complaint).

57.     On or about February 12, 2003, following the cancellation of the Sheriff's auction, the receiver sought and obtained an order permitting a reduction in the appraised value of the property.

58.     Upon information and belief, the Winn Company then sold the property to RCM Cincinnati Estates, whose corporate address, according to tax records, is in Connecticut. (See Hamilton County Auditor's Report, Ex. O to this Complaint). The purchase price was reportedly $2.6 million and RCM took title of the property on May 2, 2003.

59.     As of the filing of this complaint, RCM Cincinnati Estates still owns Huntington Meadows. Despite merely holding the property for approximately eight months, the company is now offering to sell Huntington Meadows for $10 million, a nearly 400% markup from the purchase price of the property.

### The Redevelopment Proposal

60.     Between May and October 2003, RCM representatives began meeting with two local church groups, the Allen Temple Real Estate Foundation and the Tryed Stone Missionary Baptist Church, to redevelop Huntington Meadows. Unlike Budget Real Estate, the church groups shared the City's vision of bulldozing the existing apartment buildings and replacing them with condominiums and single-family homes.

61.     Each of the churches planning to redevelop the property is located in the Seymour Avenue area near Huntington Meadows.

62.     In addition, the Allen Temple Real Estate Foundation also owns Swifton Commons, now renamed Jordan Crossing, a shopping mall directly adjacent to the Huntington Meadows property. Rev. Donald Jordan, pastor of Allen Temple, has repeatedly and publicly emphasized that Swifton Commons is not economically viable so long as Huntington Meadows remains affordable housing. By analogy, neither are the surrounding businesses, including Imperial Hall, fully viable absent middle-class development at the Huntington Meadows site.

16

63. The churches' plan to redevelop the property was informally communicated to City Council in late October 2003, as was the $10 million asking price to purchase the property. In December 2003, the City then created a $10 million line-item in its 2004 budget for Huntington Meadows redevelopment.

64. A formal proposal was submitted to City Council on January 22, 2004. The proposal called for the church groups to purchase the property, bulldoze the apartment buildings, and construct a new development called "Villages of Daybreak." The project would include a mix of $125,000 condominiums and $250,000 single-family homes, with a heavy emphasis on single-family development. The proposal itself indicates that the redevelopment plan is in furtherance of the 2000 Seymour Business District Plan. (See Church Proposal, Ex. P to this Complaint).

65. Vice Mayor Alicia Reece submitted an emergency motion to fund the church proposal. The motion called for $10 million in City funds to be provided up-front and an additional $3 million to be provided over the next three years. The motion was referred to the Finance Committee for processing.

66. The Finance Committee met on January 26, 2004 to vote on the proposal. The details of the financing package presented at the meeting indicated that the churches would contribute approximately $200,000 to the project and would use the City's $10 million to purchase the land as collateral for a $5 million loan from a private bank. The City would therefore hold a second mortgage on the property which would conceivably be valueless should the churches default on the bank loan.

17

67.     Perhaps concerned about these details, the Finance Committee postponed voting on the proposal until the February 2, 2004 meeting so that additional details of the financing proposal could be submitted to the Committee.

68.     The revamped proposal submitted to the Finance Committee on February 2, 2004 called for a slight change in the financing package. Rather than holding a second mortgage on the entire property, the City would hold a first mortgage on the first 150 homes, following the completion of which the churches would seek private finances. Based in part upon these modifications, the Finance Committee voted to refer the motion back to the full City Council for a vote. Committee members Malone and Pepper, in addition to Vice Mayor Alicia Reese, voted in favor of referring the proposal to Council. Committee members Tarbell and Crowley abstained and Committee chair John Cranley voted against the proposal. The proposal is now ripe for a vote by the full City Council on Wednesday, February 4, 2004.

### The Implications

69.     The events which both pre-dated and followed the closure of Huntington Meadows and the eviction of hundreds of families, many of whom were African-American, female-headed households, suggest that the City of Cincinnati and Vice Mayor Alicia Reece played an improper and unlawful role in the development.

70.     Since the creation of the Seymour Business District Plan in 2000, Ms. Reece has utilized her governmental influence to lead the campaign against affordable housing at Huntington Meadows. Under the rhetoric of assisting families, Ms. Reece propositioned the federal government for assistance in relocating the tenants. In addition, Ms. Reece repeatedly sought reports and updates on the "City's involvement" in redeveloping the property. Ms. Reece has also moved that the City

provide emergency financing to convert Huntington Meadows from affordable rental housing to single-family homes, despite the fact that Hamilton County's loan documents specifically prohibit such a development. These actions were, and currently are, calculated and designed to improve the value of her father's nearby property. In addition, upon information and belief, these actions were, and currently are, calculated and designed to obtain a more direct financial benefit for Ms. Reece and her family. These actions were taken at the expense of, and were motivated to harm, African-American females living at Huntington Meadows. These actions also undermined Budget Real Estate's business interests in Cincinnati and precluded redevelopment of the property that would have limited the resulting harm to the residents and the City's taxpayers.

## FACTS SPECIFIC TO CLASS MEMBERS

### Donna Farmer

71.     Plaintiff Donna Farmer was a tenant at the Huntington Meadows complex from 1991 until its closure in 2002. She lived in various units at the complex with her 12-year-old daughter and 14-year old son.

72.     In Ms. Farmer's observation, maintenance at the property became less conscientious in 1998 when the PM Group purchased the property and began government-funded renovations. She had various maintenance problems with her apartment, including the existence of some interior mold. She was told by the Health Department that the mold was not of a toxic level and therefore could be repaired. Neither PM Group nor Huntington Meadows Limited made any attempts to repair the mold in her apartment.

73.     Ms. Farmer was involuntarily evicted from the complex in late August or early September 2002. She was aware of the $500 relocation offer, but did not accept it because she did

not want to waive her rights to sue the landlord and receiver.  She was therefore left to her own resources to find another suitable living arrangement.

74.     Despite her best efforts to locate another affordable apartment, Ms. Farmer became homeless when the Huntington Meadows complex closed.  She was assisted by Bethany House, a local social services agency for women facing homelessness.  The organization housed Ms. Farmer in a motel for approximately one-and-a-half months until she could find more permanent housing.  She and her children now living in a low-rent apartment on Oak Street in Cincinnati.  As a result of this ordeal, Ms. Farmer and her children have suffered tremendous emotional distress.

### Juanita Mitchell

75.     Juanita Mitchell is a former resident of Huntington Meadows and the president of the Huntington Meadows Resident Council.  She was active in fighting the evictions that occurred in late August 2002 and intervened as a plaintiff in the foreclosure action against Huntington Meadows Limited.

76.     Ms. Mitchell was present in court the day the $500 relocation package was being negotiated.  Ms. Mitchell was adamant with the Legal Aid attorneys representing her and the other tenants that she would not agree to any relocation settlement that provided less than $1000 per tenant.

77.     Despite this fact, the Legal Aid attorneys told Ms. Mitchell that she could go home and that they would call her to inform her of the next court dates.  The attorneys then went back into the judge's chambers with the other parties, including attorneys representing the City of Cincinnati, and agreed to the deal which forced the tenants out.  The Legal Aid attorneys negotiated and agreed to the $500 settlement without Ms. Mitchell's consent.

78.     Ms. Mitchell did not accept the $500 relocation agreement. Instead, she involuntarily left the complex in late August or early September 2002 and relocated to a different apartment. She suffered extreme emotional distress as a result of this ordeal.

**Jackie Gaines**

79.     Jackie Gaines is a former tenant at Huntington Meadows who, like Ms. Farmer and Ms. Mitchell, was involuntarily evicted in September 2002.

80.     Ms. Gaines was recruited by Huntington Meadows after the foreclosure action was initiated and signed her lease while the foreclosure action was pending. At no time did any representative of Huntington Meadows Limited inform Ms. Gaines that the property might be foreclosed and the property permanently closed.

81.     Ms. Gaines accepted the $500 relocation offer and agreed to leave the complex by September 3, 2002. Despite complying with her responsibilities under the agreement, including leaving her apartment in a clean condition and returning the key to management, Ms. Gaines was never paid her $500.

82.     After leaving Huntington Meadows, Ms. Gaines had difficulty locating another place to live. In fact, the relocation efforts and expenses required to find another home caused Ms. Gaines to lose her job.

83.     As a result of being unemployed, Ms. Gaines suffered tremendous financial and emotional strain. As of the filing of this complaint, she has yet to locate a stable residence and steady employment.

**Annie Davis**

84.     Annie Davis was a long-term tenant at Huntington Meadows.  She originally lived in a townhome on Rhode Island Ave. for five years, then relocated to a smaller apartment for approximately one year.  Ms. Davis' friend Bobby Woods shared her apartment with her.  In addition, Ms. Davis' mother, Mable Thomas, also lived in the complex.

85.     In August 2002, Ms. Davis was informed that she would be evicted and the complex closed due to health hazards.  However, Ms. Davis never observed any mold or asbestos in her unit and did not believe any health hazard to exist in her apartment.

86.     Like Ms. Gaines, she was also informed about the relocation package.  Ms. Davis accepted the $500 allotment and agreed to move out of the complex by September 3, 2002.

87.     Ms. Davis, however, had difficulty locating another residence.  She spent more than $500 to locate a new apartment and to move her belongings.  She feels that the money was insufficient to compensate her for the damage she suffered in having to uproot her home.  In addition, she suffered extreme emotional anguish as a result of what happened to her and the other Huntington Meadows residents.

## CLASS ACTION ALLEGATIONS

88.     Plaintiffs Farmer, Mitchell, Gaines, and Davis maintain this action on behalf of themselves and a class of other Huntington Meadows tenants subjected to eviction when the property closed in September 2002.  The proposed class is as follows:

> All tenants at Huntington Meadows who maintained leases with the property as of July 2002 and who left the property, either voluntarily or involuntarily, as a result of the foreclosure action against Huntington Meadows Limited.

89.     Upon information and belief, there are in excess of 600 families, many of which consisted of multiple individuals, who are members of the proposed class. To date, counsel have been contacted by approximately 40 members of the proposed class with little effort to locate them. Accordingly, given the large volume of potential plaintiffs, joinder of all class members is impracticable.

90.     The class members share common questions of law and fact, including but not limited to: 1) whether the involvement of the City of Cincinnati and its officials acting under color of state law in evicting the tenants deprived the tenants of their constitutional property, due process, and equal protection rights; 2) whether the involvement of the City of Cincinnati and its officials constituted an abuse of process under state law; 3) whether the City of Cincinnati and its officials intentionally inflicted emotional distress upon them; and 4) whether a conspiracy was in place to violate their civil rights. In addition, the class members claims arise out of a singular, identical document, namely their lease with Huntington Meadows. As such, there exists a typicality and commonality of claims amongst the class.

91.     The claims of the representative plaintiffs are typical of the claims of the class members. The named plaintiffs have been the victims of the same unlawful conduct by the City of Cincinnati and its officials and have suffered similar damages.

92.     The representative plaintiffs will fairly and adequately protect the interests of the class. The named plaintiffs have been active in seeking out information on the closure of Huntington Meadows, in maintaining contacts with prior residents who were also evicted, and in developing community support to assist those who suffered as a result. In addition, Ms. Mitchell formerly served in a leadership role with the Huntington Meadows Resident Council before the property

23

closed. They therefore have the class' interests in mind and can adequately and fairly represent the class in this litigation.

93.     A class action is superior to other available methods for the fair and efficient adjudication of this litigation, particularly since joinder of all class members is impracticable. Most members of the class cannot afford to pursue individual litigation against the City of Cincinnati and its representatives. Even if a group of class members could avoid such litigation, it would be unduly burdensome to the courts in which the litigation would proceed. Individual litigation magnifies the delay and expense of resolving controversy surrounding the City's unlawful conduct. By contrast, the class action mechanism presents far fewer management difficulties and provides the benefit of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

94.     The class as defined in this complaint may be certified pursuant to Rule 23(b)(1) of the Federal Rules of Civil Procedure in that inconsistent or varying adjudications with respect to individual class members would establish incompatible standards of conduct for the City of Cincinnati and its officials to follow and would as a practical matter be dispositive of and impede the ability to protect the interests of other members not parties to this litigation.

95.     The class may also most appropriately be certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure in that the City of Cincinnati and its officials have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive and declaratory relief with respect to the class as a whole. In this regard, Plaintiffs propose a bifurcated proceeding for liability and damages. First, liability can be assessed on a class-wide basis under Rule 23(b)(2), followed by the appointment of a special master to individually assess damages and relief amongst the individual class members pursuant to Rule 23(b)(3).

96.     The class may also be certified pursuant to Rule 23 (b)(3) in that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members. In this regard, a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## STATEMENT OF THE CASE

### Class Claims

### Claim One: 42 U.S.C. § 1983 Deprivation of Constitutional Rights

97.     Plaintiffs reallege and incorporate by reference each and every allegation in this complaint.

98.     The conduct of the City of Cincinnati and its elected and appointed representatives, all acting under color of state law, by and through a common custom, practice, or policy, and motivated by deliberate indifference, served to deprive Plaintiffs Farmer, Mitchell, Gaines, and Davis, and all others similarly situated, of their constitutional rights to substantive and procedural due process, just compensation for takings of private property, and equal protection of the law under the Fifth and Fourteenth Amendments to the United States Constitution and related provisions of the Ohio Constitution.

99.     More specifically, the City of Cincinnati and its representatives engaged in a course of conduct which deprived the named Plaintiffs and all others similarly situated of their property interest in their residences without due process of law and which in effect constituted a taking of private property absent just compensation. These actions were motivated by a discriminatory purpose, namely to move poor African-American females out of the Seymour Avenue neighborhood. The actions were thus motivated by race and gender in violation of the Equal Protection Clause of

25

the Fourteenth Amendment. These actions also had a disparate impact upon African-American females in violation of the Equal Protection Clause.

## Claim Two: 42 U.S.C. § 1981 Interference with Private Contracts

100.    Plaintiffs reallege and incorporate by reference each and every allegation in this complaint.

101.    The conduct of the City of Cincinnati and its representatives impaired the rights of Plaintiffs Farmer, Mitchell, Gaines, and Davis, and all others similarly situated, to make and enforce contracts for affordable housing and also denied the named Plaintiffs and class members the full and equal benefit of the law in entering into those contracts. These actions were taken under color of state law and for a discriminatory purpose, namely to relocate poor African-American females from the Seymour Avenue area.

## Claim Three: 42 U.S.C. § 1985 Conspiracy

102.    Plaintiffs reallege and incorporate by reference each and every allegation in this complaint.

103.    The City of Cincinnati and its representatives, including Vice Mayor Alicia Reece, conspired with various outside entities, including but not limited to PM Group, Huntington Meadows Limited, the Winn Company, RCM Cincinnati Estates LLC, Allen Temple Real Estate Foundation, and/or Tryed Stone Missionary Baptist Church, to deprive Plaintiffs Farmer, Mitchell, Gaines, and Davis, and all others similarly situated, of the equal protection of the laws. The conspirators then made several overt actions in furtherance of the conspiracy by encouraging tenants to vacate the premises. These actions were taken under color of state law and for a discriminatory and unlawful purpose.

104. The conspiracy violated the civil rights of Plaintiffs Farmer, Mitchell, Gaines, and Davis, and all others similarly situated, by taking their property without due process and/or just compensation, and by denying their right to equal protection. The actions of the conspiracy intentionally targeted African-American females and had a disparate impact on African-American females.

### Claim Four: Breach of Contract

105. Plaintiffs reallege and incorporate by reference each and every allegation in this complaint.

106. By planning, conspiring, and colluding to convert the Huntington Meadows complex from affordable housing to more expensive single-family homes, the City of Cincinnati has caused a breach of the contract that exists between the Federal National Mortgage Association and Hamilton County. Because the contract was adopted for the benefit of Plaintiffs Farmer, Mitchell, Gaines, and Davis, and all others similarly situated, they constitute third-party beneficiaries. In addition, because the contract was made to run with the land, it is binding upon the City. The City's attempts to redevelop Huntington Meadows violate the express terms of the contract.

### Claim Five: Abuse of Process

107. Plaintiffs reallege and incorporate by reference each and every allegation in this complaint.

108. The City of Cincinnati and its representatives, including Vice Mayor Alicia Reece, committed an abuse of process by attempting to utilize the legal foreclosure process, and the process for seeking aid from the federal government, to accomplish an improper purpose. That purpose was to increase the value and profitability of property owned by Ms. Reece's father and to do so by

discriminating against, and violating the constitutional rights of, African-American females living at the Huntington Meadows complex.

109.     In accomplishing this purpose, Ms. Reece, on behalf of the City of Cincinnati, fraudulently sought funding from the federal government and improperly urged tenants, either directly or through others, to vacate the property.

110.     In this regard, the City of Cincinnati and Ms. Reece attempted to employ a legitimate process for a legitimate purpose in an improper manner and with an ulterior motive.

### Claim Six: 42 U.S.C. § 3604 Fair Housing Act Violations

111.     Plaintiffs reallege and incorporate by reference each and every allegation in this complaint.

112.     The City of Cincinnati and its representatives violated the terms of the Fair Housing Act, 42 U.S.C. § 3604, by discriminating against the named Plaintiffs and all others similarly situated in the provision of housing and other services on the basis of their race and gender.  The named Plaintiffs and all other similarly situated individuals are members of a protected racial class, namely African-Americans, who maintained leaseholds for apartments at Huntington Meadows.  The City of Cincinnati and its representatives discriminated against Plaintiffs on the basis of their membership in this protected class.

### Budget Real Estate's Claims

### Claim Seven: 42 U.S.C. § 1981 Interference with Private Contracts

113.     Plaintiffs reallege and incorporate by reference each and every allegation in this complaint.

114.    The conduct of the City of Cincinnati, by and through its representatives, and its representatives impaired the rights of Budget Real Estate, Inc. to make and enforce a purchase contract for Huntington Meadows.  These actions were taken under color of state law and for a discriminatory purpose, namely to relocate poor African-American females from the Seymour Avenue area.

### Claim Eight: 42 U.S.C. § 1985 Conspiracy

115.    Plaintiffs reallege and incorporate by reference each and every allegation in this complaint.

116.    The City of Cincinnati and its representatives, including Vice Mayor Alicia Reece, conspired with various outside entities, including PM Group, Huntington Meadows Limited, the Winn Company, RCM Cincinnati Estates LLC, Allen Temple Real Estate Foundation, and/or Tryed Stone Missionary Baptist Church, to deprive Budget Real Estate, Inc. of the equal protection of the laws.

117.    The conspiracy violated the civil rights of Budget Real Estate, Inc. by taking its property without due process and/or just compensation and by denying its right to equal protection. The actions of the conspiracy intentionally targeted African-American females and had a disparate impact on African-American females, which in turn impeded Budget Real Estate, Inc.'s ability to enter into a purchase contract for the Huntington Meadows property.

### Claim Nine: Abuse of Process

118.    Plaintiffs reallege and incorporate by reference each and every allegation in this complaint.

29

119.    The City of Cincinnati and its representatives, including primarily Vice Mayor Alicia Reece, committed an abuse of process by attempting to utilize the legal foreclosure process, and the process for seeking aid from the federal government, to accomplish an improper purpose.  That purpose was to increase the value and profitability of property owned by Ms. Reece's father and to do so by discriminating against, and violating the constitutional rights of, African-American females living at the Huntington Meadows complex.

120.    In accomplishing this purpose, Ms. Reece, on behalf of the City of Cincinnati, fraudulently sought funding from the federal government and improperly urged tenants, either directly or through others, to vacate the property.  Ms. Reece and other City officials also improperly interfered with the potential purchase contract between Budget Real Estate, Inc. and the Federal National Mortgage Association.

121.    In this regard, the City of Cincinnati and Ms. Reece attempted to employ a legitimate process for a legitimate purpose in an improper manner and with an ulterior motive.

**Claim Ten: Tortious Interference with Business Relationships**

122.    Plaintiffs reallege and incorporate by reference each and every allegation in this complaint.

123.    The City of Cincinnati and its representatives tortiously interfered with the business relationship between Budget Real Estate, Inc. and the Federal National Mortgage Association.

124.    By virtue of Budget's offer to purchase the mortgage note held by the Federal National Mortgage Association, there existed a business relationship between Budget and Fannie Mae.  The City of Cincinnati and its representatives were aware of this relationship and intentionally interfered with the purpose of terminating the relationship.

125.    Budget Real Estate, Inc. suffered financial damage as a result of the City's actions. Had the City not interfered with and intentionally blocked Budget's offer to purchase the property, Budget would now own Huntington Meadows.  The property is currently being sold on the market for $10 million.  As such, absent the City's tortious conduct, Budget would now hold a $10 million asset.

### Claim Eleven: 42 U.S.C. § 3604 Fair Housing Act Violations

126.    Plaintiffs reallege and incorporate by reference each and every allegation in this complaint.

127.    The City of Cincinnati and its representatives violated the Fair Housing Act, 42 U.S.C. § 3604, by refusing Budget Real Estate, Inc.'s offer to purchase Huntington Meadows on the basis of the race and gender of the prospective residents of the complex.

128.    The named Plaintiffs and all other similarly situated individuals are members of a protected racial class, namely African-Americans, who maintained leaseholds for apartments at Huntington Meadows. The City of Cincinnati and its representatives discriminated against Budget Real Estate, Inc. on the basis of its prospective tenants' membership in this protected class.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Farmer, Mitchell, Gaines, and Davis, and all others similarly situated, and Budget Real Estate, Inc. pray for the following relief from Defendant City of Cincinnati:

1.    Certify that this action proceed as a class action on behalf of the class defined herein;

31

2.      Declare that the City of Cincinnati's conduct, as well as the conduct of its representatives, violates 42 U.S.C. §§ 1981, 1983, 1985, and 3604; constitutes a breach of contract; constitutes an abuse of process; and constitutes tortious interference with business relationships;

3.      Preliminarily and Permanently enjoin the City of Cincinnati and its agents, representatives, and officers from continuing the abuses described above and order that Defendants:

   a)      Discontinue any plans to redevelop the Huntington Meadows property for any use outside of its designated use as affordable housing; and

   b)      Refrain from using public funds towards the redevelopment of Huntington Meadows for any use outside of its designated use as affordable housing;

4.      Order specific performance of the contractual restriction on the use of the Huntington Meadows complex;

5.      In light of the contract between the Federal National Mortgage Association and Hamilton County, order that Hamilton County be joined as a necessary plaintiff pursuant to Rule 19 of the Federal Rules of Civil Procedure;

6.      Award monetary compensation as follows:

   a)      Award Plaintiffs Farmer, Mitchell, Gaines, and Davis and all class members the value of their actual expenditures, including but not limited to relocation costs, security deposits, and application fees,   incurred as a result of the City of Cincinnati's, and its representative's, unlawful conduct;

   b)      Award Plaintiffs Farmer, Mitchell, Gaines, and Davis and all class members the value of the emotional distress, pain, and suffering they incurred as a result of the City of Cincinnati's, and its representative's, unlawful conduct;

   c)      Award Plaintiff Budget Real Estate, Inc. the value of its lost business opportunity, including but not limited to the fair market value of the Huntington Meadows property less any liens or mortgages Budget would have incurred in purchasing the property, in addition to the reasonable profit Budget could have realized had the City of Cincinnati and its representatives not engaged in the unlawful conduct described above;  and

d)      Award Plaintiffs Farmer, Mitchell, Gaines, Davis, and Budget Real Estate, Inc., as well as all class members, punitive damages.

7.      Pursuant to 42 U.S.C. § 1988, award Plaintiffs' attorney fees, the cost of maintaining this action, and interest, including prejudgment interest; and

8.      Award such other and further relief as the court may deem just and proper.

Respectfully submitted,

JENNIFER M. KINSLEY (Ohio Bar No. 0071629)
(Trial Attorney)
H. LOUIS SIRKIN (Ohio Bar No. 0024573)
Sirkin Pinales & Schwartz LLP
105 West Fourth Street, Suite 920
Cincinnati, Ohio 45202
(513) 721-4876
spms@fuse.net

--and--

KENNETH L. LAWSON (Ohio Bar No. 0042468)
AYANNA LOVE (Ohio Bar No. 0074473)
Kenneth L. Lawson & Associates
808 Elm Street, Suite 100
Cincinnati, Ohio 45202
(513) 345-5000
kenneth@lawsonandassoc.com
ayanna@kennethlawson.com

Counsel for Plaintiffs Farmer, Mitchell, Gaines, Davis, and Budget Real Estate, Inc.