IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Donna Farmer, *et al.*, | : | Case No. 1:04-CV-080 |
| | : | |
| Plaintiffs, | : | District Judge Susan J. Dlott |
| | : | |
| v. | : | ORDER GRANTING MOTIONS TO |
| | : | DISMISS AND ORDERING |
| City of Cincinnati, *et al.,* | : | ADDITIONAL BRIEFING ON |
| | : | MOTION TO DISMISS |
| Defendants. | : | |
| | : | |

This matter comes before the Court on Defendant City of Cincinnati's Motion to Dismiss (doc. #43), Defendant RCM Cincinnati Estate LLC's Motion to Dismiss (doc. #46) and Defendant Allen Temple-Tryed Stone Development, Ltd.'s Motion to Dismiss (doc. #55). For the reasons that follow, the Court **GRANTS** Defendant RCM Cincinnati Estate LLC's ("RCM") motion and Defendant Allen Temple-Tryed Stone Development, Ltd's ("ATTSD") motion, and **ORDERS** additional briefing on Defendant City of Cincinnati's ("City") motion.

I.  FACTUAL AND PROCEDURAL BACKGROUND

This suit arises from the closure of Huntington Meadows, formerly the City's largest affordable housing complex, the eviction of the tenants therefrom, and plans to redevelop the property as single-family housing. (Doc. #37 ¶ 13.) Plaintiffs Donna Farmer, Juanita Mitchell, Jackie Gaines, and Annie Davis (collectively, the "Individual Plaintiffs") were former residents of Huntington Meadows. (Id. ¶ 1.) Huntington Meadows was located in the Cincinnati neighborhood of Bond Hill. (Id. ¶ 15.) The property was adjacent to a formerly defunct shopping center known as Swifton Commons and a nearby conference center owned by Steve Reece, the father of former City Councilmember and former City Vice-Mayor Alicia Reece.

1

(Id.) In September 1998, the City, Hamilton County and private funders provided $30 million in assistance to PM Group, Inc., a for-profit corporation, to renovate the Huntington Meadows complex. (Id. ¶ 16.) The City provided a below-market loan of almost $4 million as part of the financing package. (Id. ¶ 16, 17.) Hamilton County's financing agreement with Huntington Meadows, Ltd. ("HM Ltd."), the PM Group subsidiary which owned Huntington Meadows, included a Land Use Restriction Agreement dated July 1, 1997 which restricted the property from use as anything other than affordable housing while the bonds were outstanding. (Id. ¶ 17 & ex. A.)

Alicia Reece was elected to City Council in 1999 and she made a formal motion before City Council on May 24, 2000 for the City to spend $30 million to redevelop the Seymour Avenue area in Cincinnati which included Huntington Meadows. (Id. ¶ 18.) The Cincinnati Planning Commission adopted the Seymour Business District Plan ("Seymour Plan") in October 2000 which called for the redevelopment of the area "into a retail, commercial, housing, entertainment and recreation district" by providing tax abatements, grants, and other incentives to property owners in the area and which "contained a component to promote home-ownership nearby." (Id. ¶ 19, 21.) City Council approved the Seymour Plan in March 2001. (Id. ¶ 22.)

Beginning in 2001, sometime after City Council approved the Seymour Plan, the PM Group sought to evict over 300 tenants from Huntington Meadows for failing to pay rent. (Id. ¶ 25.) Also around this time, residents of Huntington Meadows lodged complaints with management about rodent infestation, broken appliances, and other maintenance problems. (Id.) HM Ltd., the PM Group subsidiary, then missed its May 2001 mortgage payment to the Federal National Mortgage Association ("Fannie Mae") and Fannie Mae filed a foreclosure action in the

Hamilton County, Ohio Court of Common Pleas ("the state foreclosure action") against HM Ltd. (Id. ¶ 26; Federal Nat'l Mortg. Assoc. v. Huntington Meadows Ltd., No. A0103458 (Hamilton Cty. Ohio C.P. May 30, 2001).)  Near that time, the PM Group filed for bankruptcy in Michigan. (Doc. #37 ¶ 26.)  The foreclosure action was stayed pursuant to the bankruptcy and then reinstated December 21, 2001.  (Id. ¶ 26, 28; Federal Nat'l Mortg. Assoc., No. A0103458 (Hamilton Cty. Ohio C.P. Dec. 21, 2001).)

Also in and around late 2001, Alicia Reece made a series of inquiries into Huntington Meadows and the City's involvement with the property.  (Doc. #37 ¶ 29.)  At some point before December 19, 2001, the City had backed the issuance of a $400,000 forgivable loan to the Allen Temple Real Estate Foundation to purchase Swifton Commons, the shopping center adjacent to Huntington Meadows.  (Id. ¶ 15, 31.)  Finally, the City's Director of Neighborhood Services issued contrary statements first on December 12, 2001 supporting the maintenance of Huntington Meadows as affordable housing, and then on December 19, 2001 stating that it was not the interest of City Council or unidentified stakeholders to maintain it as affordable housing.  (Id. ¶ 30, 32 & ex. D.)

After the state foreclosure action was reinstated, the Huntington Meadows Tenants Association ("Tenants Association") and Plaintiff Juanita Mitchell both intervened in the foreclosure action.  (Federal Nat'l Mortg. Assoc., No. A0103458, slip op. (Hamilton Cty. Ohio C.P.  June 18, 2002).)  The state court appointed a receiver to manage the property.  (Doc. #37 ¶ 34.)  The receiver commissioned a study of Huntington Meadows by Clayton Group Services ("the Clayton study") to investigate the residents' maintenance complaints.  (Id. ¶ 36.)  The Clayton study report, issued on July 1, 2002, determined that asbestos, mold, and other bio-

3

contaminants were present on the property and recommended a $10.5 million remediation. (Id. ¶ 36.) Subsequent inspections by the Cincinnati Health Department confirmed the presence of asbestos, but only in non-residential areas, and overall suggested that the unhealthy conditions at the property were not as widespread and that the costs of remediation might not be as high as had been reported by the Clayton study. (Id. ¶ 38-41.) After the issuance of the second round of reports, Alicia Reece wrote a letter to the HUD office in Washington D.C. stating that Huntington Meadows posed a health risk to the tenants, stating that the complex would be closed, and asking for relocation assistance for the tenants, despite the fact that there had been no official determination or announcement that the complex would be closed. (Id. ¶ 42.)

On July 31, 2002, the state court issued an Agreed Order in the foreclosure action, signed by the parties in that suit including the City of Cincinnati and the intervenors, which permitted Huntington Meadows to be closed and authorized the receiver to terminate the existing leases effective August 31, 2002. (Id. ¶ 43; Federal Nat'l Mortg. Assoc., No. A0103458, slip op. (Hamilton Cty. Ohio C.P. July 31, 2002).) Tenants who agreed to leave Huntington Meadows by September 3, 2002 and who agreed not to sue were to receive a $500 check. (Ids.) Huntington Meadows officially closed in September 2002. (Doc. #37 ¶ 46.) Individual Plaintiffs were evicted from the complex in or around August or September 2002. (Id. ¶ 83, 85, 87, 90, 91, 96, 98.) Subsequently, on April 4, 2003, the state court issued a Judgment Entry by which the Clerk of Court was ordered to discharge the July 1, 1997 Land Use Restriction Agreement. (Federal Nat'l Mortg. Assoc., No. A0103458, slip op. (Hamilton Cty. Ohio C.P. Apr. 4, 2003).)

Prior to the official closing of Huntington Meadows, Plaintiff Budget Real Estate, Inc.

4

("Budget R.E.") offered on August 23, 2002 to purchase the property from Fannie Mae for $2 million and expressed an intention to maintain the property as affordable housing. (Doc. #37 ¶ 50 & ex. J.) Fannie Mae representatives recommended that Budget R.E. meet with City officials about their proposal. (Id. ¶ 52.) Budget R.E. officials met with Peg Moertl, the Director of Neighborhood Services, and a representative from the office of Cincinnati City Councilwoman Alicia Reece. (Id. ¶ 53.) Ms. Moertl's and Ms. Reece's representatives stated that the City sought to have townhomes and single-family houses built on the property and indicated their intention to discourage Fannie Mae from selling to Budget R.E. (Id.) Plaintiffs allege upon information and belief that Fannie Mae rejected Budget R.E.'s offer because of the City's objections. (Id. ¶ 56.)

Approximately around this same time, the property was appraised at a value of $3.9 million in the state foreclosure action. (Id. ¶ 57.) Fannie Mae ultimately chose to sell their Note on Huntington Meadows to the Winn Company for a price believed to be $1 million. (Id.) The property then was to be sold by Sheriff's auction on January 23, 2003, but the auction was continued so the Winn Company could develop a more specific site plan. (Id. ¶ 58.) The Winn Company sold the property effective May 2, 2003 to the Defendant RCM for $2.6 million. (Id. ¶ 60.) Between May and October 2003, RCM met with two church groups, the Allen Temple AME Church and the Tryed Stone Missionary Baptist Church about redeveloping Huntington Meadows. (Id. ¶ 62, 64.) The churches' intent was to replace the rental apartments with condominiums and single-family homes. (Id. ¶ 62.) The churches formed a non-profit group, Defendant ATTSD, to further their redevelopment plan. (Id. ¶ 63.) Reverend Donald Jordan, the pastor of Allen Temple, stated publicly that Swifton Commons, the shopping mall adjacent to

Huntington Meadows, was not economically viable so long as the property remained affordable housing. (Id. ¶ 65.)

The churches informally communicated to City Council an offer to purchase Huntington Meadows for $10 million in October 2003. (Id. ¶ 66.) The City in December 2003 created a $10 million line-item in its 2004 budget for the Huntington Meadows redevelopment. (Id.) The churches formally submitted their $10 million proposal in January 2004 to purchase the property, bulldoze the apartment buildings, and construct a new development of condominiums and single-family homes called "Villages of Daybreak," in direct furtherance of the Seymour Plan adopted by the City in 2000. (Id. ¶ 67.) The City Council voted on February 4, 2004 to help finance ATTSD's proposal for Huntington Meadows. (Id. ¶ 69-71.) As of the date of the filing of the Second Amended Complaint, RCM had agreed to sell the property to ATTSD for $10 million. (Id. ¶ 61.) However, RCM was still listed as the property owner on the Hamilton County Auditor's website as of that filing. (Id. ¶ 61, 75.) Demolition at the Meadows began in March or April 2004 and is now complete. (Id. ¶ 72, 76.)

Plaintiffs summarize what they allege to be the tortious or illegal activities of Defendants in a section of the Second Amended Complaint called "Implications." (Id. ¶ 81-82.) They allege that the City and former Vice Mayor Alicia Reece "played an improper and unlawful role" in the closure of Huntington Meadows and the eviction of the tenants, "many of whom were African-American, female-headed households." (Id. ¶ 81.) Further, they allege that the actions in regard to Huntington Meadows were calculated to financially benefit Alicia Reece and her family and were motivated to harm African-American females living at Huntington Meadows. (Id. ¶ 82.) Finally, they allege that these actions also undermined Budget R.E.'s business interests and

precluded redevelopment that would have minimized harm to tenants and City taxpayers. (Id.)

On February 3, 2004, Individual Plaintiffs and Plaintiff Budget R.E. initiated this action against the City of Cincinnati. (Doc. #1.) This case, for reasons not relevant to the disposition of the pending motions, has been reassigned multiple times to different United States District Court Judges for the Southern District of Ohio. Plaintiffs have amended the Complaint twice, filing the Second Amended Complaint (doc. #37) against the City of Cincinnati, RCM, and ATTSD on July 26, 2004. Individual Plaintiffs assert civil rights, contract, civil conspiracy, abuse of process and fair housing claims against the City, and conspiracy and fair housing claims against ATTSD and RCM. Budget R.E. asserts contract, civil conspiracy, abuse of process, tortious interference and fair housing claims against the City, and conspiracy and fair housing claims against the ATTSD and RCM. Plaintiffs also seek certification of a class of former tenants of Huntington Meadows who left the property as a result of the foreclosure action. All three defendants have filed motions to dismiss the various claims asserted against them on multiple grounds. (Docs. #43, 46, 55.)

## II. LEGAL STANDARD ON A RULE 12(B) MOTION TO DISMISS

Rule 12(b)(1) authorizes a dismissal of a complaint where the Court lacks jurisdiction over the subject matter of the complaint. See Fed. R. Civ. P. 12(b)(1). The plaintiff has the burden of establishing the Court's jurisdiction when such a dismissal motion is filed under Rule 12(b)(1). See Rogers v. Stratton Industs., Inc., 798 F.2d 913, 915 (6th Cir. 1986).

Rule 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In assessing the sufficiency of a complaint, the Court must follow "the accepted rule that a complaint should not be dismissed for failure to state

a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). This accords with the purpose of Rule 12(b)(6), which the Sixth Circuit Court of Appeals has explained "is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." Mayer v. Mylod, 988 F.2d 635, 638 (6th Cir. 1993). The defendant, as the movant, bears the burden of demonstrating that the plaintiff has failed to state a claim. See Bangura v. Hansen, 434 F.3d 487, 498 (6th Cir. 2006). Therefore, "[o]n a Fed.R.Civ.P. 12(b)(6) motion, all of the allegations contained in the plaintiff's complaint are accepted as true, and the complaint is construed liberally in favor of the party opposing the motion." Miller v. Currie, 50 F.3d 373, 377 (6th Cir. 1995). At the same time, however, the Court "need not accept as true legal conclusions or unwarranted factual inferences." Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987). Nor is the Court required to accept as true complaint allegations that are contradicted by public records and other evidentiary materials of which the Court may take judicial notice. See Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002); Sprewell v. Golden State Warriors, 266 F.3d 979, 988, amended upon denial of rehearing, 275 F.3d 1187 (9th Cir. 2001); VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP, 348 F. Supp. 2d 255, 263 (S.D.N.Y. 2004). Finally, the Court must scrutinize with "special care" a motion to dismiss a complaint filed under a civil rights statute. See Perry v. McGinnis, 209 F.3d 597, 603 (6th Cir. 2000).

### III. ANALYSIS

### A. City of Cincinnati's Motion to Dismiss

Plaintiffs assert numerous causes of action against the City of Cincinnati, alleging in essence that City played an unlawful role in the closure of Huntington Meadows, the eviction of the tenants, and the proposed redevelopment of the property into more expensive single-family homes.  Plaintiffs would appear upon initial examination to face an exceedingly difficult burden in attempting to prove the causation element of each of their claims against the City.  This is because Huntington Meadows was closed and the affordable housing land use restriction was discharged pursuant to an Agreed Order and a Judgment Entry, respectfully, in the state foreclosure action initiated by Fannie Mae.  See Federal Nat'l Mortg. Assoc., No. A0103458, slip op. (Hamilton Cty. Ohio C.P. July 31, 2002); id. slip op. (Hamilton Cty. Ohio C.P. Apr. 30, 2003).  The merits of Plaintiffs' claims, of course, are not before the Court at this stage.  However, the binding or preclusive effect on the Plaintiffs' claims, if any, of judgments issued in the state foreclosure action is at the heart of the City's Motion to Dismiss.

The City argues that Plaintiffs' claims fail as a matter of law because, among other reasons, the Court lacks jurisdiction under the Rooker-Feldman doctrine to decide the claims and/or that the claims are barred under the doctrines of issue and claim preclusion.  Regarding Rooker-Feldman, both the United States Supreme Court and the Sixth Circuit Court of Appeals have issued significant new decisions delineating the contours of the doctrine in the time since the briefing on this motion was completed.  See Exxon Mobile Corp. v. Saudi Basic Indust. Corp., 544 U.S. 280 (2005); McCormick v. Braverman, 451 F.3d 382, 396 (6th Cir. 2006).  It is in the interests of justice to give the parties a chance to re-address the application of Rooker-Feldman in light of these new precedents.  The parties are urged to address with specificity and citation to applicable legal authorities (1) whether Individual Plaintiffs were "state court losers"

9

as that term is used in the referenced cases; (2) whether the claims asserted in this action are "inextricably intertwined" with the issues in the state foreclosure action; and (3) whether the source of Plaintiffs' injuries as stated in the Second Amended Complaint is the state court judgment itself or the City's actions.  Also, because the parties will be given a chance to address the apparent changes to Rooker-Feldman, the Court also urges the parties to re-brief the related issues of issue and claim preclusion.

For example only, Plaintiffs contend that they were not parties to the state foreclosure action, while the City contends that Individual Plaintiffs were parties because the Huntington Meadows Tenants Association intervened in the state foreclosure action.  Neither side cites any legal authority to support their position.  The parties should brief whether the Individual Plaintiffs were in privity with the Tenants Association citing to the relevant pleadings from the state foreclosure action and to applicable legal authority.  Also relevant, but not yet adequately briefed, is what rights the intervenors in the state foreclosure action asserted and whether the nature of a foreclosure action in the State of Ohio limited the types of civil rights and other tort claims that could have been asserted therein.

Accordingly, the Court orders the parties to submit supplemental briefing on the issues of whether this Court has jurisdiction to hear the claims against the City of Cincinnati and whether the claims asserted herein are barred by issue or claim preclusion.  The City of Cincinnati shall file its supplemental brief within 21 days of the date of this Order and the Plaintiffs shall file their supplemental response within 21 days after the City files its brief.

**B.      ATTSD's and RCM's Motions to Dismiss**

      **1.      Civil Conspiracy Claims**

In Count Three, Individual Plaintiffs allege that ATTSD and RCM conspired in violation of 42 U.S.C. § 1985 with the City and its representatives to deprive them of equal protection of the laws and to take property without due process or just compensation.  (Doc. #37 ¶ 115-16.)  In Count Eight, Budget R.E. alleges that ATTSD and RCM conspired in violation of 42 U.S.C. § 1985 with the City and its representatives to deprive Plaintiffs of equal protection of the laws and to take property without due process or just compensation by impeding Budget R.E.'s ability to enter into a purchase contract for the Huntington Meadows property.  ATTSD and RCM each move to dismiss the conspiracy claims alleged against them.

Section 1985 of Title 42 states in relevant part:

> If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . ; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).  To establish a claim under this civil conspiracy statute, a plaintiff must prove "(1) a conspiracy involving two or more persons (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws and (3) an act in furtherance of the conspiracy (4) which causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States."  Johnson v. Hills & Dales General Hosp., 40 F.3d 837, 839 (6th Cir. 1994) (citation omitted).  The plaintiff also must prove that "the conspiracy was motivated by a class-based animus."  Id.

In addition, a plaintiff must plead a § 1985 claim with "with factual specificity; mere

11

conclusory allegations will not survive a motion to dismiss." Ashiegbu v. Purviance, 74 F. Supp. 2d 740, 750 (S.D. Ohio 1998).  The court in Ashiegbu required the plaintiff, in order to survive a dismissal motion, to "allege (1) specific conduct that violated his rights, (2) the time and place of that conduct and (3) the identity of the responsible parties."  Id.  Other courts have stated more generally that a § 1985 conspiracy cause of action can be dismissed either where the conspiracy is alleged only in conclusory fashion without factual specificity or where the plaintiff failed to plead class- or race-based animus.  See e.g., Dallas v. Holmes, 137 Fed. Appx. 746, 752-53 (6th Cir. 2005) (but suggesting that alleging class membership and discrimination based on class may be sufficient for the latter requirement); Jaco v. Bloechle, 739 F.2d 239, 245 (6th Cir. 1984).

     Here Individual Plaintiffs have not pleaded the conspiracy with sufficient factual specificity, and relatedly, have failed to state a claim upon which relief can be granted. Individual Plaintiffs have alleged in Count Three that the ATTSD and RCM conspired with the City and others to deny Individual Plaintiffs rights and, in particular, that the defendants "made several overt actions in furtherance of the conspiracy by encouraging tenants to vacate the premises."  (Doc. #37 ¶ 115.)  The conclusory legal allegations are not supported by the more specific factual allegations stated elsewhere in the Second Amended Complaint.  Rather, Plaintiffs allege that (1) Allen Temple Real Estate Foundation in 2001 purchased Swifton Commons with a $400,000 forgiveable loan backed by the City of Cincinnati (id. ¶ 31); (2) that the Winn Company (purchasers of the mortgage note on Huntington Meadows previously held by Fannie Mae) sold the property to RCM for $2.6 million effective May 2, 2003–seven months after Huntington Meadows had closed operations as affordable housing (id. ¶ 46, 60); (3) that RCM then met with ATTSD between May and October 2003 about redeveloping Huntington

Meadows as single-family housing (id. ¶ 62-64); (4) that ATTSD informally and formally petitioned the City for financing to help them redevelop the Huntington Meadows property in late 2003–more than one year after Huntington Meadows officially closed (id. ¶ 46, 66-67); and (5) that RCM has agreed to sell ATTSD the property for $10 million as of the date of the filing the Second Amended Complaint (id. ¶ 61).

These allegations, if true, fail to state a claim that ATTSD or RCM conspired in any way that would have caused injury to Individual Plaintiffs. Individual Plaintiffs allege that they have been injured by their eviction from Huntington Meadows and by the plan to redevelop the property as single-family housing. Plaintiffs acknowledge in the Second Amended Complaint and the state foreclosure action records indicate that it was pursuant to an Agreed Order dated July 29, 2002 that the Huntington Meadows was closed and the receiver authorized to evict the tenants. (Id. ¶ 43; Federal Nat'l Mortg. Assoc., No. A0103458, slip op. (Hamilton Cty. Ohio C.P. July 31, 2002). Further, the state court issued a Judgment Entry ordering that the Land Use Restriction Agreement dated July 1, 1997 be discharged. See Federal Nat'l Mortg. Assoc., No. A0103458, slip op. (Hamilton Cty. C.P. April 30, 2003). ATTSD and RCM were not parties to the state foreclosure action. Individual Plaintiffs have pleaded no facts that would connect ATTSD or RCM to the state foreclosure action or to other events preceding the foreclosure which might be argued to have affected the Individual Plaintiffs' rights.

The sole factual allegation concerning either defendant occurring before the foreclosure is that Allen Temple Real Estate Foundation received a City loan to purchase Swifton Commons in or about December 2001. (Doc. #37 ¶ 15, 31.) This fact is too attenuated to the closure of Huntington Meadows and the alleged injuries suffered by Individual Plaintiffs to be relevant.

13

The remaining factual allegations against RCM and ATTSD involve actions to purchase and redevelop Huntington Meadows occurring at least seven months after Huntington Meadows had closed and the Individual Plaintiffs had all been evicted. (Doc. #37 ¶ 61-67.) Individual Plaintiffs simply have failed to plead facts that would state a claim that ATTSD and RCM joined a conspiracy which caused injury or deprivation of rights to Individual Defendants. See Johnson, 40 F.3d at 839 (elements of § 1985 claim). Accordingly, the Court will dismiss Count Three against ATTSD and RCM as a matter of law.

Likewise, Budget R.E.'s conspiracy claim fails. Plaintiffs allege in the Second Amended Complaint that Budget R.E. offered in August 2002 to purchase Huntington Meadows from Fannie Mae with the express intent of maintaining the property as affordable housing. (Doc. #37 ¶ 50.) Plaintiffs further allege that Fannie Mae sold their mortgage note on the property to a different entity, the Winn Company, and not to Budget R.E. because the City had communicated its displeasure with Budget R.E.'s intent to maintain the property as affordable housing. (Id. ¶ 55, 57.) Budget R.E.'s offer to purchase the property from Fannie Mae was made eight months before RCM purchased the property from the Winn Company, and eight months before RCM began redevelopment discussions with ATTSD. (Id. ¶ 60, 62.) Plaintiffs do not allege that ATTSD or RCM was involved directly or indirectly in the sale negotiations between the Fannie Mae and Budget R.E. As such, Budget R.E. has failed to plead facts that would state a claim that ATTSD or RCM joined a conspiracy which caused it injury or a deprivation of rights. Accordingly, the Court will dismiss Count Eight as a matter of law.

### 2. Fair Housing Act Claims

In Count Six of the Second Amended Complaint, Individual Plaintiffs allege that ATTSD

14

and RCM, along with the City, violated the Fair Housing Act, 42 U.S.C. § 3604, by discriminating against them in the provision of housing and other services on the basis of their race and gender. (Doc. #37 ¶ 124.) In Count Eleven, Budget R.E. alleges that ATTSD and RCM, along with the City, violated the Fair Housing Act, 42 U.S.C. § 3604, by refusing Budget R.E.'s "offer to purchase Huntington Meadows on the basis of the race and gender of the prospective residents of the complex." (Id. ¶ 139.) The Fair Housing Act prohibits discrimination against an individual in the provision of housing on the basis of the person's race, color, religion, sex, familial status, or national origin. See 42 U.S.C. § 3604. ATTSD and RCM move to dismiss the fair housing claims for failure to state a claim upon which relief can be granted.

For the reasons that follow, the facts alleged fail to support a fair housing claim against ATTSD or RCM as a matter of law. As to the Individual Plaintiffs' claim against ATTSD, Individual Plaintiffs have failed to plead facts that would support a finding that ATTSD at any relevant time was "in a position directly to deny a member of a protected group housing rights." Michigan Prot. and Advocacy Serv., Inc. v. Babin, 18 F.3d 337, 344 (6th Cir. 1994) (interpreting the handicap discrimination provision of the Fair Housing Act). According to the Second Amended Complaint, ATTSD was not the legal owner of the property when this action was initiated and, in any event, the apartment buildings on the former Huntington Meadows property had been demolished. (Doc. #37 ¶ 61, 75, 76.) ATTSD could not have refused to sell or rent, or refused to negotiate the sale or rental of Huntington Meadows apartments to Individual Plaintiffs on the basis of their race or gender if they did not own or control the property. See 42 U.S.C. § 3604(a). Likewise, they could not have discriminated against Individual Plaintiffs in regards to

15

the "terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith" on basis of their race or gender.  See 42 U.S.C. § 3604(b).

As to Individual Plaintiffs' claim against RCM, RCM did not purchase Huntington Meadows until seven months after the property was closed and the tenants evicted pursuant to the foreclosure action.  (Doc. #37 ¶ 46, 60.)  Individual Plaintiffs have not alleged that RCM has offered housing units at the property for sale or rental to any prospective buyers or renters, that RCM has refused to offer units at the property for sale or rental to them, or that RCM otherwise has discriminated against them.  See 42 U.S.C. § 3604(a)&(b).  Individual Plaintiffs' claim against RCM is not saved because they have alleged that RCM agreed to sell the property to ATTSD, a party who intends to redevelop it as single-family housing.  Individual Plaintiffs do not allege that RCM refused to sell or negotiate sale to any other entity, much less that they refused to sell or negotiate a sale to another entity because that entity intended to maintain the property as affordable housing or intended to lease housing to African-Americans or women.

Likewise, Budget R.E.'s fair housing claim against ATTSD and RCM fails for the same reason that its conspiracy claim against the defendants failed.  Budget R.E.'s claims are based on Fannie Mae's refusal to sell the property to Budget P.E.  Plaintiffs have not pleaded any facts that would support a finding that ATTSD or RCM were involved in any way with the Fannie Mae's disposition of the property.  As such, Budget R.E. has not stated a fair housing claim against ATTSD or Fannie Mae.

Accordingly, the Court will dismiss Counts Six and Eleven against ATTSD and RCM as a matter of law.

**IV.	CONCLUSION**

For the foregoing reasons, Defendant RCM Cincinnati Estate LLC's Motion to Dismiss (doc. #46) and Defendant Allen Temple-Tryed Stone Development, Ltd.'s Motion to Dismiss (doc. #55) are **GRANTED**. Additionally, Defendant City of Cincinnati and the Plaintiffs are **ORDERED** to submit additional briefing as set forth above.

IT IS SO ORDERED.

    s/Susan J. Dlott
Susan J. Dlott
United States District Judge